ROANE, Judge.
This is an action of ejectment brought by the appellant against the appellee for a lot in the town of Winchester. The principal object of the suit is, to try the title of the appellant to a rent of five shillings per " annum alleged to be due on the said lot, and claimed by him as grantee under Denny Fairfax. The said Fairfax having in his deed expressly reserved all quit-rents, the appellant has no right to recover in this casé, if this court be of opinion, that the rent in question is a quit-rent. Being clearly’ of opinion, that that rent is a quit-rent, I shall confine my observations principally to that point, although other topics were discussed at large in the argument.
It is expressly agreed in the case before us, that the two shillings per hundred acres reserved on lands granted in the Northern Neck, and on those granted in the other parts of Virginia, before the revolution, was, throughout those territories respectively, denominated a quit-rent. It is also admitted by the counsel on all sides, in this argument, that those sums are and were quit-rents; although Mr. Call, counsel for the appellant, has made a complete felo de se of his admission, by bringing us to the test of the English idea of a quit-rent. He contends, under that standard, and refers to 2 Black. Com. 42, that it is essential to a quit-rent that the land should be held under a manor, and also that, on payment of the rent, the tenant should go quit of all former services.
If this be the true standard, then the said two shillings rent is not a legal quit-rent: Then there never were any quit-*rents in this country; for 1st, the grant for land by lord Fairfax, stated in the 4th finding of the ease (and it is further found that all the grants for waste lands were uniformly alike) makes no mention whatever of a manor; and 2dly, the grant by the governour of Virginia, stated in the 6th finding of the case, (and all his grants were undoubtedly alike in this respect) annexes other services, besides the payment of the rent, to be rendered by the tenant, viz. the cultivation and improvement of the land. That gentleman, then, must either give up this favourite English criterion of á quit-rent, or retract the concession he has made. As such a retraction cannot for a moment be contemplated, we must resort to some other criterion of a quit-rent, adapted to the ease of the said two shillings, and decisive of the question before us. The criterion I shall embrace is that which is sanctioned by the popular and legislative understanding on the subject, through a long succession of time.
That tinderstanding has thrown into the class of quit-rents, those rents reserved to the king, or proprietor, as the case may be, on an absolute grant of ■ waste land ; on a grant, too, for which an original price was paid, generally denominated composition money, and on which a trifling rent is reserved, as a mere feudal acknowledgment of tenure. This understanding was universal as it related to the two shillings rent, because that rent was also universal, throughout the whole country. The rent of five shillings in question was only, not universally, so denominated, because it was in itself local and particular. It was not known in remote places that such a rent existed, but so far as such knowledge did extend, viz. in and about the town of Winchester, the rent in question is agreed to have been generally denominated a quit-rent by the people, and sometimes so denominated by lord Fairfax’s agents. Had towns and grants of this description been generally established throughout that territory, there is no question, but that this rent would have been as universally denominated a quit-rent, as the rent of two shillings per hundred acres on lands.
*1 have said that .the rent of two shillings per hundred acres on land was universally understood to be a quit-rent; but, in this, I am incorrect. The understanding was confined to the territories of the Northern Neck, and of the residuary part of Virginia, respectively, in relation to their own respective quit-rents. The people of the one knew nothing (so far as we can judge from the case agreed) of the rents existing in the other territory, and there is no usage found, on this subject, extending beyond their own respective rents and confines. Like the five shillings rent nowin question, the two shilling rents were universally so denominated by the people respectively to whom they were known, and by whom they were payable, but no further. There is, therefore, in this respect, a perfect analogy between the two cases. Am I not, therefore, correct in saying that the rent of five shillings is as much sanctioned as a quit-rent by the popular opinion and understanding, within the sphere of its existence, as the rent of two shillings?
*990 If there be any general passages in our laws, or in any treaties upon our laws, which seem to confine the idea of quit-rent to the two shillings rent, we must attribute it to the same want of knowledge of the existence of this local rent of five shillings. But this court cannot now plead such ignorance in excuse. The case is properly brought before us; and we may try this rent by the same standard and the same principles as apply to the general rent of two shillings per 100 acres.
The rent before us entirely corresponds with the two shillings rent, payable on lands in the Northern Neck, in all its essential features? For 1st. The tot granted in this case is expressly stated in the deed to have been “heretofore waste and un-granted land.” It is also further agreed, that there is no survey extant of that land prior to the establishment of the town of Winchester. The act of assembly on that subject does not pretend, that that land was ever before granted, or appropriated; and the aid of the legislature was only obtained for the purpose of conferring, on the grantees *of lots, the privileges enjoyed by the freeholders and inhabitants of other towns: As to any right of property passing from the grantor to the grantee of the lots, the act of assembly is wholly silent and inapplicable. This feature, then, of being land ungranted by the proprietor, prior to the very grant in question, places this lot on a common ground with general grants of vacant tracts of land in the said territory. 2d. It is found that composition money was paid on the grant of this lot, as was also the case on granting vacant tracts of land, and the grants, in both cases, convey the absolute property. It is not indeed stated in the case, that the price paid for the lot was called composition money : that might have been deemed by the appellee unnecessary to be stated, as I presume it is. It is enough that that price agrees with the general composition in all its essential features. 3d. In both species of grants, the rent is denominated alike: it is called, j.n both grants, a “rent,” ora “fee rent,” and is not called a quit-rent in either. 4th. In both cases the said rents are respectively perpetual; and Sth. The rents, in both cases, are of trivial sums, fully adequate to import an acknowledgment of tenure, but in no degree commensurate with the annual value of the lands. Wherefore, then, shall we merely, on the ground of variation in the amount of the rent or composition (a circumstance well compensated by the difference of situation and value) differ the cases of the two rents, and lose sight of all those great traits, which are common to them both?
I touch not those cases in which lord Fairfax stood in any other relation, than merely as lord of the fee. I touch not those, in which he had become a private proprietor. The general assembly of Virginia, anxious to abolish feudal and perpetual rents, due to the government of Virginia and to lord Fairfax, as soon as his rights had fallen into the hands of aliens, respected, as beyond their reach, that perpetual revenue which may have been, in a multitude of instances, reserved by one individual from another, on grants of land held by private ownership.
*Anxious to free our people from those inconsiderable though degrading rents which so strongly partook of a feudal nature, and which were due to the lord of the fee, they respected those rents which were due to the private owners of the soil; which were of considerable amount; which bore some proportion to the actual value or profits of the lands; and which (the grantee having never paid a price for the land, on an absolute acquisition thereof,) formed the only compensation, receivable bj the proprietor, for the possession and enjoyment of his land.
I understand that this rent is now to be recovered on the principle that it is a ground rent: but I call on this court to shew any instance of a ground rent, in which the lessor of the premises had not acquired a private right to soil. Nord Fairfax was fully sensible of the distinction which existed beween his proprietary rights and‘his private rights of the soil. It was his uniform practice to make a conveyance of lands in fee in the usual form to some friend, and take back a re-conveyance thereof, when he meant to acquire the private fee simple property in them. The case before us expressly finds that this was done in relation to the two manors, and to the lot No. 18, in the town of Winchester. In relation to the manors, this might (but for the uniform practice aforesaid) have probably been dispensed with ; for the leases granted to the tenants thereof convey not the absolute property of the soil, and carry on the face of them, almost in every line, strong badges of private ownership on the part of the lessor. No man can read those leases, and hesitate for a moment to believe that lord Fairfax’s intention was to convert the soil of those manors into private property; yet that was not sufficient in the opinion of the proprietor: those lands also were subjected by him to the uniform process of a conveyance and re-conveyance. But not only those conveyances, but those in relation to lot No. 18, in the addition to the town of Winchester, shew strongly lord Fairfax’s practice and sense on this subject. If this court should now adjudge the lot in question, or the rent *accruing thereon, to be the private property of the appellant, they will differ from lord Fairfax himself, who thought a conveyance and re-conveyance necessary, whenever he wished to acquire private property. When I speak of the lot in question as not having become the private property of lord Fairfax, I speak with reference to the actual rules of his office, and his own construction of his grant. Further I would not be understood to give a decided opinion.
Were it permitted to me to go out of this record, I would refer to the 6th finding in the case of Hunter v. Fairfax, formerly argued before this court, wherein Mr. Fair-fax and the other party agreed, 1 ‘That lord Fairfax died seized in fee of sundry tracts of land in the county of Frederick, and other counties in the Northern Neck, containing altogether 300,000 acres, which had *991 been granted and conveyed by him to B. Martin in fee, upon the same terms as other lands were conveyed and granted by him in fee as aforesaid; which lands were soon thereafter re-conveyed, by the said Martin, unto him in fee.”
This word altogether, taken in connexion too with the large number of acres mentioned, strongly imports that lord Fairfax had the fee simple property in no lands in the Northern Neck, which had not undergone that process. But however that may be, as the appellant does not lay claim to all the lands, and the rents due thereon, existing in the Northern Neck, but only to such as had become the private property of lord Fairfax, or his ancestors, and has not shewn in his case, any other process by which the private property of the soil could be or was acquired by lord Fairfax than such conveyance and re-conveyance, I am perfectly warranted in saying, upon the case before us, that no other process can be known to us on this subject, how many others soever may exist (if any such in fact do exist) or rest within the private knowledge of this court. We are to try this cause upon the facts agreed between the parties, and not upon facts which may be alleged, or may in fact exist, but do not exist upon this record. I presume also *that the appellant is bound by the admissions, express or implied, of
those under whom he claims; and I also presume that lord Fairfax has strongly admitted that the private property of the lot in the deed mentioned did not exist in him, by having omitted to extend to that lot, the process he deemed it necessary to resort to, for acquiring the private property of the lot No. 18, before mentioned. Are not the admissions of lord Fairfax the admissions of the present appellant? And does not the admission, now in question, bar him from setting up the present claim? Does this court sit here to vacate the admission of parties, and to give them more than they can ask, or do conceive themselves entitled to? I presume not.
Being clearly of opinion, upon the case before us, that the private property of the soil was not, nor could be acquired by lord Fairfax, except by conveyance and re-conveyance, I can take no notice of any alleged acquisition by survey, even were that survey for lord Fairfax’s own use. All the notice of such surveys that I can now take is, that in relation to the surveys of the lots in Winchester, lord Fairfax has admitted that they did not vest the private property of the soil in him. He has admitted this, by making and taking a conveyance and re-conveyance of the lot No. 18, in said town, in order to vest in him such property therein. He has admitted that the surveys of manors, though confessedly made for his own use, were not adequate to such purpose, by using a similar process in relation to them. Can we therefore say, upon this record, that the private right of soil was acquirable in any instance by a mere survey? The act of compromise (to be hereafter more particularly noticed) states indeed, hypothetically, that this might be done. I will only add at present, that whenever a case shall occur, which will state facts to justify that inference, that act shall receive from me a correspondent construction: but the general and hypothetical words of an act, grounded perhaps on the representation of an interested party, cannot make that to have an-tecedently existed, which *'on a fair construction by the judiciary, shall be found to have had no such existence.
But whatever may be the case of the survey confessedly made for lord Fairfax’s own use, the survey of the lots in addition to the town of Winchester, was not of that character. It was for the use of purchasers who were to pay a high rate of composition upon the grant of the soil. Lord Fairfax indeed acquired a right of soil in the lot No. 18; but that not by virtue of the survey, but by virtue of the conveyance and re-conveyance before mentioned.
I have said that the act of 1752 related not at all to any rights of property respecting the lot in question. It only gave to the purchasers of lots the privileges enjoyed by the citizens of other towns. When in the second section of that act lord Fairfax is called the proprietor of the lot added to the town, it is only in 'the sense of general proprietor of the Northern Neck. It is not in the sense of private owner of the soil. This is incontestibly proved by the finding in the case, that the lot in question was waste and ungranted land prior to the grant to the person under whom the appellee claims. This act of assembly is therefore entirely incompetent to shew, that the private right of soil in the lot in question was ever acquired by lord Fairfax.
If lord Fairfax, anxious to accelerate the settlement of his territory, instead of waiting until private adventurers had found and entered for waste lands, had himself set apart and surveyed into small tracts, a large tract of waste land, and invited individuals to take grants thereof, paying a higher rate of composition and of quit-rent, in consideration of the trouble he had been at in making the said location and survey, can it be questioned for a moment that the grantees of those lands would have holden on a common footing with other grantees in his territory? But this mode is no how' different from the one before us, except that the latter relates to a lot of ground, and the former to a tract; a circumstance certainly immaterial.
*In the case before us, the very lot in question being vacant land, might, prior to the survey by lord Fairfax, have been taken up by an individual. But lord Fairfax, anxious to enlarge the town, and thereby not only quicken the settlement of the adjacent country, and thus increase his revenue, but also enhance the value of his own adjacent property, did not choose to await that slow process, but laid off the land into lots, and invited purchasers. For his trouble herein, he was amply remunerated, by the high rate of composition, required on a grant of the land. These were the motives that operated on him in this business. Wherever he appropriated or reserved any lot or lots to his own private use, let those rights be respected; but let us carry it no further. Admit that, in the *992 case before us, the survey of lots suspended the general right of adventurers to survey it as waste land, that’ suspension was clearly taken away by lord iTairfax’s invitation to persons to take grants thereof. The question is not whether; a suspension of this kind ever existed or not, but whether lord Fairfax ever acquired or intended to acquire the private right of soil in the lot in question? Most certainly he did not.
Having compared the grant in question with the general grants of waste lands in the Northern Neck, and found in them a perfect correspondence, I will now brieflj' compare it with the leases in .the manors stated in the case, and which are con-, fessedly private property, and I believe We shall find no manner of similitude between them. . The lessees of the manors have paid no original price or composition therefor: they have ’acquired no absolute property therein, but -only the use thereof during a term. ■ The rents payable therefor are 20 shillings or 40 shillings per hundred acres per annum respectively: a. sum too great for a mere feudal acknowledgment , of tenure, and bearing a good, proportion, perhaps, at the time of the grants, to the yearly value of the land. Besides, this •manor .land was not only converted into private property by the process before mentioned, but the lessees in all their covenants bear strongly. *the badges of private ownership. In all these respects, the ■ grant before us is entirely dissimilar.
If any stress is laid on the finding in the case, “that the grants of all lands were uniformly alike, except, as to grants of lots in places laid off for towns,” it may be answered, that, such variation is rendered necessary, by the difference of the subject; such as the different rates of composition and rents, and the different conditions and covenants necessary to be obtained in the two instruments. If any essential and substantial variation existed, between the two grants, going to the merits of this case, it was the duty of the appellant to have shewn them to the. court in his case. The variation stated in this finding, is satisfied by the immaterial.variations just mentioned, and which are discernable from an inspection of the grants themselves as set out in the case. That inspection does not exhibit any essential and substantial variation going to the merits of the case: the appellant himself has not stated, or even pointed out, any such; and we cannot make his case better than he himself has made it.
I come now to consider some of the acts of assembly on this subject.
The acts of October 1777, ch. 2, and May 1779, ch. 13, abolished quitrrents throughout Virginia, except in the Northern Neck. They did not invade the quit-rents of lord Fairfax, because he was a citizen, although every reason assigned for the abolition’ equally applied to his quit-rents. They did not attempt such invasion until it was ascertained, or at least believed, that those quit-rents had devolved on alien enemies. Then they did sequester them, and ultimately confiscate them.
Those acts did abolish the quit-rents in the residuary part of Virginia, after expressly premising that it was derogatory to our people to hold their lands “subject to any servile, feudal, or precarious tenure, and to prevent the danger to a free state from perpetual revenue.” Acts 1779, ch. 13, p. 98. Here then is a strong legislative exposition of what is meant by a quit-rent. It is a rent which is servile, feudal, and perpetual.
*If the power of the legislature had then extended to and been exercised oyer the quit-rents of lord Fairfax, would not the rent in question have been also emphatically included? Nay, had there been a similar grant of lots in the other part of Virginia by the governour, would not the rents reserved thereon have been equally destroyed? Can it be denied that the rent in question is a servile and feudal rent, or that the appellant can claim it only as successor to the lord of the fee? for the lot in question had never been specifically appropriated by lord Fairfax to his own use. If the decision of the district court be now reversed, will you not, sir, create a lord paramount as to the property in question? And "will not the inhabitants of Winchester be subjected forever to the degrading vassalage of paying to such lord paramount, a servile, feudal and perpetual revenue? Will you not place those citizens in .that abject state, from which the legislature of o'ur country, at the very instant of the revolution, solicitously laboured to emancipate all our people? Will you not in fact, sir, revive upon the people of the Northern Neck, a partial proprietorship? How far that proprietorship may hereafter be attempted to be extended in consequence of the precedent now to be set, and the principles now contended for, I pretend not to determine. Great, as I trust the respect of this court will ever be for the rights of private property claimed by any suitor, I hope we shall never favour mere feudal and seignoral rights: nor permit ourselves to carry back our people, or any section of our people, to that degrading state of vassalage, so strongly ‘depicted by our laws; and, from which, the revolution ought to have liberated them.
When the legislature of Virginia, by the act of 1779, discharged all ‘ ‘proprietors of lands” not only from quit-rents, but from all other “reservations and conditions in the patents or grants of land from the crown of England,” extending even to a discharge from the condition of cultivating part of the land granted, would not this abolition equally have extended to lots in town, (if there were any such,) granted ^merely and directly by the crown? Are not the owners of the lots equally “proprietors of lands,” within the very language of the act; and would not every reason of the law equally extend to them? Nay, as the condition of cultivating a portion of the lands granted, is equally useful to the country with the condition of building upon lots granted in towns, would not this latter condition have been equally destroyed, when imposed only by the grant, however it would have been saved, as not being within the act of 1779, when imposed by an act of assembly?
*993 The analogy is very strong between what the assembly actually did by the acts of 1777 and 1779, in relation to Virginia in general, and what they would have do^e at the same time in relation to the Northern Neck, had they not been restrained by a respect for lord Fairfax’s rights as a citizen. The abolition, however, effected by those acts, has been extended to the Northern Neck, since the death of lord Fairfax.
If the act of 1777, ch. 2, which gave credit to the people of the Northern Neck for their quit-rents, as part of the public tax, has, by the terms of it, seemed to confine quit-rents to the rent of two shillings per 100 acres on land, is there a single reason why this indulgence should not have been equally extended to the owners of the lots in question? Are we not to consider it, at most, as an omitted case; as a case only omitted on account of the locality of the rent, and the ignorance of its existence, on the part of the legislature?
But if this be relied on as a legislative exposition of a quit-rent; if this court is rxot permitted to say, that where there is the same reason, there is the same law, shall not that body be permitted to correct itself? Shall not other legislative expositions be equally respected? In the very same clause of that very act, the legislature has corrected itself, by defining a quit-rent to be a servile, feudal and perpetual rent. This same idea is also kept up in the act of 1779, as before stated; and in the act of 1782, ch. 8, the citizens of the Northern Neck are credited for their quit-rents, by *the general terms of “all quit-rents;” leaving it to the judiciary to decide what those quit-rents are. Do not these legislative expositions entirely embrace the rent before us, and abundantly overpower the solitary exposition which has been relied on? And if the act of 1777, by the particular terms of it, excluded the citizens of Winchester from the benefit thereby conferred, in opposition to the reason and equity of the case; do not the general terms of 1782, authorize us to comprehend those citizens, and effectuate the manifest intention of the legislature, by placing all those who stand under like circumstances upon a common and equal ground? I conclude, therefore, most clearly, that the legislative definition and exposition of a quit-rent, as well as the popular understanding on the subject, entirely extends to, and includes the rent now in question. I will only add as a further legislative idea, on the subject before us, that the act of 1785, ch. 67, (and perhaps other acts,) has coupled together and destroyed composition and quit-rents ; thereby plainly meaning to comprehend, as quit-rents, all those rents reserved in grants, for which composition money is paid, upon an absolute acquisition of the property.
I have asked this honourable court, whether it will, by a reversal of the judgment before us, revive upon the people of the Northern Neck, a partial proprietorship. I will go further and ask, whether they will do this, notwithstanding the renunciation of such proprietorship by Mr. Fairfax, under whom the appellant claims? That renunciation is explicitly contained, so far at least as it respected the vacant lands, in the agreement stated in the act of compromise of 1796. The renunciation did not, indeed, extend expressly to the obsolete and derelict claim of quit-rents, for reasons presently to be assigned or alluded to. That renunciation is also founded' upon a full and valuable consideration; upon the grant by the commonwealth of Virginia, of at least 300,000 acres of land,, claimed by Mr. Fairfax, as his private property ; but which, it is notorious, 'would, have been withheld from him, (but for the compromise aforesaid,) by *the-judgment of this court, affirming that of the district court, who had adjudged that his alienage deprived him of all rights under lord Fairfax’s will.
According to ordinary calculation, it would have been supposed that that renunciation, and the act of assembly founded thereon, had given a death blow to the proprietary rights in the Northe-n Neck. Exclusive of the proprietary right to vacant lands, there is only one other aspect, in which it is possible for such proprietorship to be revived, or contemplated; and this, it seems, is to be the ground work on which this superstructure is now to be raised. The trifling sum now in dispute, like the foothold required by Archimides, is to produce consequences which none can foresee, or estimate. Notwithstanding that the act of 1796, did not deign to comprehend quit-rents in the renunciation therein contained on the part of Mr. Fairfax; notwithstanding the general assembly preter-mitted this most favourable opportunity of effectuating such purpose; for certainly under the then circumstances of the case, the rapacity of Mr. Fairfax, or his grantees, might have been well satisfied with the enormous grant of 300,000 acres of perhaps the best lands in the Northern Neck; we are now to be assailed; a proprietorship is now to be resuscitated on this obsolete and exploded ground of quit-rent!
I will only add upon this subject, that the omission to comprehend quit-rents in the renunciation contained in the act of 1796, arose most probably from its being believed to be a mere act of supererogation. That belief might have arisen (to say nothing of the merits of the case) not only from the non-claim of those quit-rents on the part of Mr. Fairfax when he was claiming all the rest of lord Fairfax’s estate, but also (among other minor circumstances) from the explicit disavowal of lord Fair-fax’s right thereto, made in the Virginia convention of 1788, among others, by the very able gentlemen who afterwards, as a purchaser under Mr. Fairfax, negotiated the compromise with the general assembly *"of Virginia. (See new edition of the debates, page 397.)
As the claim to the two shillings rent, formerly payable on lands in the Northern Neck, may probably gain strength from the decision -this day to be given, and I mean not to prejudge any thing, I ought, perhaps, to make an apology for having said this much upon the subject. My apology is, that in my view, that rent is absolutely identified with the five shillings rent *994 now in question. I see no essential difference whatever between them. In the discussion of this case, therefore, I .cannot entirely keep separated things which in my judgment are intimately blended. If the five shillings quit-rent is now to be recovered, it is of little consequence what name the court may please to annex to it; whether they denominate it a quit-rent, or a ground rent. If some future claimant of the two shillings quit-rent shall be able to shew to a future court, as the appellee’s counsel have now shewn to me, that there is no essential difference whatever between the two rents, would he not on the authority of the decision now to be given, have a right to demand that that rent be also adjudged to be a ground rent, and that a recovery be, on that ground, awarded in his favour? any sequestrations or confiscations of quit-rents, by the legislature, notwithstanding? Would he not in fact, sir, be entitled to use this very decision as a precedent?
Although this court should now decide the five shillings rent to be no quit-rent, it does not decide, and cannot decide, between the now parties, the two shillings rent to be a quit-rent. Any thing which may fall from any of the judges in this cause, to shew the said two shillings rent to be a quit-rent, will hereafter be considered as entirely extra-judicial. It will be perfectly competent therefore, for any future claimant to shew that that rent is no quit-rent, and therefore recoverable, by shewing that there is no essential difference whatever between it and the present rent, and to use this decision as a precedent, which will declare the two shillings rent to be recoverable.
*1 have thus endeavoured to shew that the English idea of a quit-rent, as contended for on the part of the appellant, must be absolutely exploded' in this country, as not squaring with even those rents, which have been universally admitted to be quit-rents: That, according to that idea, there was no such thing as a quit-rent in this country; and that, as the only alternative, the popular and legislative idea on the subject must be resorted to, and that both embrace the rent in question: That, in respect of every essential feature whatever, there is a perfect correspondence between the rent before us, and the two shillings rent payable on land; and that the rent in question has been absolutely destroyed by the legislature, in common with the two shillings rent, by their abolishing all servile, feudal and perpetual rents.
In the whole course of this business, I lay great stress upon the circumstance that the land in question has never been appropriated by lord Fairfax to his own use. In the language of the act of 1796, (the act of compromise,) it has never been specifically appropriated and reserved to his own use, either “by deed or actual survey:” nay further, it has never been so appropriated and reserved by any other mode adopted by lord Fairfax, (if there are any others admissible upon this record,) to effectuate that purpose. So far from being made the private property of lord Fairfax, it had legally become the private property of the appellee and those under whom he claims; and on payment of the rents (be they quit-rents or not) no power on earth could justly deprive them of the land. This land was not more specifically appropriated by lord Fairfax to himself than any other tract granted out in the Northern Neck, nor were these rents more specifically appropriated to his own use, than the rents of two shillings per 100 acres reserved on lands. Lord Fairfax had an ultimate seignoral' right over the whole, but no private right in any. If Mr. Wood, who is stated in the act of 1752 to have granted out the original lots in the town of Winchester, had reserved a perpetual rent thereon, and especially if that rent had borne some *reasonable proportion to the annual value of the lots; nay, if lord Fairfax had, on similar terms, granted out his lot No. 18, in the said town, the said rents reserved thereon would have been ever respected by me as private property. But the rent in question, for want of a previous acquisition of the private property of the soil by lord Fairfax, stands only in the class of those feudal and perpetual rents, so strongly-exploded, and ultimately sequestered and confiscated by the legislature. How then does the appellant claim in the present instance?
It never has been decided, nor I believe would it be decided by this court that Denny Martin took any beneficial interest in lands under lord Fairfax’s will. It is objected that no inquest of office was ever found in relation to the rent in question: But I apprehend the sequestering and confiscating acts are equivalent thereto. It never could be expected, that there should be as many particular inquests of office as there are tracts of land in the Northern Neck. This general inquest amply supplies their place. I understand the appellant’s counsel, however, to wave this discussion, and to bottom themselves upon the act of compromise. Let us more particularly examine that act, and see whether Denny Martin is authorized by it to convey a title to the rent in question.
That act begins with a resolution, that in case the devisees of lord Fairfax will relinquish all claim to lands in the Northern Neck unappropriated at the time of lord Fairfax’s death, it would be adviseable for the commonwealth 1 ‘to relinquish all claim to any lands specifically appropriated by the said lord Fairfax to his own use either by deed or actual survey.” This resolution was replied to by Mr. Marshall, on behalf of the purchases of the land in the Northern Neck, who states, that he had considered the foregoing resolution, and had “determined to accede to the proposition it contains,” and declares that deeds shall be executed on their part extinguishing all claim to the waste lands, provided an act passes during that session “confirming on *the execution of such deeds the title of those claiming under Mr. Fairfax to lands specifically appropriated and reserved by the late Thomas lord Fair-fax, or his ancestors, for his or their own use.” The act then goes on to say, that upon the execution of such a deed as by *995 the said proposal and agreement the said purchasers are bound to execute 11 all claim, right and interest of the commonwealth of Virginia in or to any lands lying within the said Northern Neck, which is by the terms of the said proposal and agreement to be relinquished, shall be thenceforth extinguished, null and void; and the said Denny Fairfax, &c. enabled to hold,” &c.
Now, can any thing be clearer, than that this act only extends to “lands specifically appropriated by lord Fairfax to his own use by deed or survey?” Or at most, under a liberal construction of the compromise, to rents which he had so specifically appropriated ; which he claimed as a private owner of the said lands or rents, and not merelj' as lord proprietor of the territory? Nothing can be clearer than that that act never meant to extend either to lands held by others in absolute right under the proprietor, or to rents due thereon and reserved by him only in that character, and as a mere acknowledgment of tenure.
In every point of view, therefore, I am clearly of opinion that the judgment of the district court is right, and ought to be affirmed.
• LYONS, President, CARRINGTON, Judge, and FLEMING, Judge.
In considering this cause, it w 11 be necessary, in the first place, to dispose of the question relative to the nature of the estate of lord Fairfax in the lands lying within the Northern Neck; for, upon the decision of that, most of the other points in dispute will depend : And we think that, independent of his seignoral rights, he was tenant in fee simple, without any act to be done. For the patent, to his ancestor, lord Cul-peper, was to him, “his heirs and assigns forever, and to his and their only use and behoof, and to no other use, intent or purpose whatsoever:” Which is the *aptest and most ample expression of a fee simple known in the law. Litt. 1 1.
The next question that occurs is, Whether the rent in dispute was a quit-rent?
And we think it was not. For it is in form a rent charge, Co. Litt. 143; Lili. Convey. 269, 270; and has no resemblance to a quit-rent, as a slight attention to circumstances will shew.
Under the feudal system, the lords of large districts of land kept part for their own use, which was called the manor, and was the seat where their authority and jurisdiction were exercised; the rest they distributed among their tenants, to be held of the manor, subject to indefinite services, 2 Black. Com. 90; which, for a sum of money, or certain fixed services, were af-terwards, by agreement between them, commuted into a small rent, payable to the lord in his seignoral character, in lieu of all other services. The sum of money, or fixt services, thus agreed for as the price of the exchange, was called a composition; and the rent a quit-rent, because it quit the tenant of all other services. Spelm. Gloss. 476; 2 Black. Com. 96. Consequently, there could be no quit-rent without a composition and a feudal tenure: And, to prevent disputes, the term itself, or some equivalent expression, was inserted in the deed. Pow. C. R. lib. 4, § 429.
In imitation of this practice, the kings of England, who considered this country as conquered from the Indians, and like Ireland, subject to the feudal law, granted the lands here to be held as of their manor of East Greenwich in England, and took a certain sum for composition, and a rent of one shilling sterling for every fifty acres of waste land granted; which being, necessarily, in lieu of all other services, as the grant required none but that, was uniformly called a quit-rent, and pervaded the Northern Neck, before the date of the proprietor’s title. Old Virginia Laws, 279.
Things being thus situated, lord Fairfax, upon taking possession of the district, followed the course which had been pursued by the crown ; took the same composition; ^exacted the same rent; and adopted the form of the patent, except that he did not mention the manor, as it was unnecessary, his character and residence implj'ing it.
The rent thus exacted by the proprietor was also called a quit-rent; was known, by that name, throughout the Northern Neck; and was constantly , so understood by the legislature. For all the acts, passed during the war, are expressly confined to it; and that of 1785 either has no relation to the quit-rents due to lord Fairfax, or it is a law upon the same subject, and should receive the same construction; especially as it couples composition and quit-rents together, and thereby indicates the species to be destroyed.
This view of the subject exempts the rent in question from the operation of the acts of assembly relied upon by the appellee’s counsel.
But it is said that this definition is felo dese; for, according to that idea, there could have been no quit-rent here, as there could have been no manor in Virginia. That, hovrever, was not the theory of the English law; lord Wexford’s case, Davies’s Rep. 15. Penn v. Lord Baltimore, 1 Ves. 449; and- the frequent recognition, by the legislature, of the seignoral rights of the proprietor, (among which the patent enumerates the power of creating, manors) shews they were understood here according to the notion in England.
Let it be otherwise, however; still that did not prevent a particular class of rents from acquiring a name and other incidental qualities from a supposed analogy to the English practice; and therefore it is unimportant whether there was a manor or not. For if the parties acted under the idea that there was one, and established the rent in conformity to it, it comes to the same thing.
To obviate this, it was said that the rent in question corresponds with the one shilling sterling rent in all its essential features ; and therefore may properly be called a quit-rent also. But we do not discover the resemblance. For there is no composition, nor retention of the seignoral rights expressed *in the deed: On the contrary, the grant is for a rent of greater amount, reserved to lord Fairfax, not as proprietor, but in his natural char *996 acter, and in the ordinary form of a rent charge. To call it a quit-rent, therefore, is to pervert the term, and apply it to an object of a different nature.
The analogy, however, is supposed to consist in the duration and size of the rents; both of which, it is said, are free rents, and trivial, though fully adequate to establish the tenure; and that the composition may be inferred from the price.
But that whole argument surrenders the points in controversy, as it admits the necessity of a composition and tenure, without establishing the existence of either of them in the present case. For neither the duration, nor the si-ze of the rent, decides the character of it, there 'being many small rents, throughout the state, which nobody ever thought of calling quit-rents: and neither composition nor tenure can be inferred from any thing expressed in the grant, or set forth in the case agreed: Not the first, for the grant does not contain a syllable to that effect: Not the second; because the ten pounds mentioned there are stated as money received for the lots themselves, and not as composition for the services. This is decisive, as nothing can be added to the written contract, 8 Co. 155; especially where the object would be to impress a seignoral dependence, which the representative of the grantor does not allege, and the assertion of it would, at the time of the grant, have been odious to the grantee.
Again it was said, that the quit-rents in the manor of Leeds shew that the _ term was not confined to those of one shilling sterling.
The first answer to this is, that the deed is so imperfectly set forth, that it does not appear whether there was a composition expressed or not; nor what was the quit-rent spoken of: for it could not be the forty shillings; because that is reserved in a subsequent independent clause, and is there called *a rent, and not a quit-rent. But let it be that there was no composition stated in the deed, and that the forty shillings was the quit-rent intended, the exception will only prove the rule, as it shews that when a quit-rent, not of the common kind, was meant, it was expressed in the grant. Besides as the grant there is not in fee, the reversion was necessarily in the lord as feudal proprietor, 2 Black. Com. 175; and the deed, by naming it a quit-rent, shewed that the parties understood it to be in lieu of all other services; which was equivalent to the word composition.
It is said, however, that the rent in dispute had aquired the name by reputation, as such rents were called quit-rents by some of the collectors of lord Fairfax, and generally by the inhabitants of Winchester.
But there is no proof that the proprietor, or Lemon, ever recognized the term, or that it had grown into use any where else: And, if the contracting parties did not intend, at the date of the grant, that it should be a proprietary or feudal right, it could not become so afterwards. 6 Co. 64; Co. Lift. 202; 4 Co. 31.
After all, if it were admitted, that the rent in question was a quit-rent of some denomination or other, it would not help the appellee. For it seems to be given up that it does not come within the words of the acts of assembly, which are guardedly confined to the one shilling sterling. The admission therefore would not affect the appellant’s title.
To obviate this, it was urged, that the legislature were either unacquainted with the term, or that it was not recollected by them.
But that argument, instead of removing the difficulty, increases it, as it tends to prove that the rent in question was not contemplated at the time; and consequently was not intended to be embraced by the acts of assembly. Besides it is inconceivable how, if it was a known term and feudal in its nature, it could for so many years have escaped the attention of the legislature, the people of Winchester, and *the county representatives, during the enactment of such a number of successive laws upon the subject.
The preliminary words in the act of 1779, “that the proprietors of land within this commonwealth may no longer be subject to any servile, feudal, or precarious tenure; and to prevent the danger to a free state from perpetual revenue,” were next resorted to, in order to prove that the rent was extinguished.
But the first answer is, that the rent in question was neither servile, feudal, nor precarious; nor more perpetual than any other rent charge. The second is, that the succeeding words of the act of assembly explain the views of the legislature, and ascertain, precisely, the quit-rents which were to be destroyed, limiting them to such as were reserved to the crown.
It is said, however, that lord Fairfax had not, by conveyance, and re-conveyance, acquired the land as private property, but continued to hold it as proprietor, without being owner of the soil; and therefore could not reserve a ground rent out of it.
But we do not perceive the force of the objection. For we have already said, that the original grant from the crown was in fee simple; and it is unquestionably true, that the lord of a manor is owner of the soil held by him, the seignory being onlj’ an incident, and not part of the estate. Bro. Man. pi. 2; Bro. Comprise, pi. 30; 15 Vin. 228. Therefore conveyances and re-conveyances whenever made were from abundant caution, or for particular purposes only. For if they were in fee simple, without expressing tenure, they broke the seignory pro tanto. 15 Vin. 228; 1 Leon. 124; 6 Mod. 45. And if the first deed retained the tenure, the seignory was never destroyed ; which shews that, as a general position, such acts were useless, and could only have proceeded from the motives just ascribed to them.
The next enquiry is, as to the operation of the devise to Denny Martin Fairfax?
The law is clear, that an alien may take by grant. 4 Leon. 84. And there seems to be no distinction between ^friends and enemies; for lord Coke says, that it was decided in Croft’s case that, if an alien enemy takes a lease (which is part of the land), the king shall *997 have it. 1 Inst. 2. This proves that even an alien enemy may take by grant: And there is the same reason for his taking by devise. For the statute enables the testator to dispose of his lands by will; and transfers the possession, without any act to be done, to the devisee, who takes bv purchase, exactly as the grantee does. Perk. 4 505; Co. Xjitt. Ill, a. Therefore, in the case of Hogan v. Jackson, it was held, “That a devise of lands operated as an appointment to uses, in nature of a legal conveyance;” and 1 ‘ being considered as a species of conveyance, they are to be governed by the same rule.” Cowp. 305, 306. Accordingly the best commentators have considered it in that view. Thus, Shep. Touch. 414, states, “That regularly whosoever may be a grantee may be a devisee or legatee;” and Powell arrives at the same conclusion. Pow Dev. 316. But, passing by the opinions of mere jurists, and coming to adjudged cases, that of the Attorney General v. Duplessis, or Knight v. Duplessis, may be considered as an authority in point, and was as follows:
In Trinity term 1751, the attorney general filed an information in the exchequer, charging that the devisee was an alien, and praying the usual relief. The defendants insisted that no office had been found, and that there was no proof of alienage. Upon a motion to stay waste, the court took time to consider, 2 Ves. sen. 286: and while they had it under advisement, the heirs at law of the testator filed a bill in chancery charging also that the devisee was an alien, and praying that a receiver might be appointed, and the deeds inspected. A motion for the receiver' was made, on the 20th of July, 1751; and although the attorney general did not oppose the principle of the motion, he suggested that it might possibly interfere with the cause in the •exchequer. Upon which lord Hardwicke observed, that he did “not remember any distinction between a grant, conveyance or devise to an alien ;” but refused the receiver, without deciding *the cause. The defendants then filed a demurrer to the information ; which necessarily put the point of law upon the alienage in issue, as the demurrer admitted it. The demurrer was overruled in 1752, and that judgment affirmed in the house of lords. 2 Ves. sen. 287. When the cause went back to the exchequer, a commission of escheat was ordered, and found for the devisee. But the crown officers, being dissatisfied, issued another original commission instead of a writ of melius inquirendum; and the defendants filed a petition to stay execution of the new process, upon the ground that under the former commission the devisee had been found not to be an alien. The petition came on, in July 1754, to be heard before lord Hardwicke- and the chief baron ; who were both of opinion, that, although an original commission was wrong, a melius inquirendum would have been proper. For, said the chief baron, “If the contrary (that is alienage) be found, she may traverse;” and lord Hardwicke following that opinion, says, “But, if found for the king, she may traverse that within the statute; and must plead that she is indigena born in these kingdoms, and traverse that she is an alien.” 2 Ves. sen. 540, 545. Which necessarily decided that the devise was good ; for, if it had been void, the estate would have descended upon the heirs at law, and the crown would have had no title.
That case therefore proves, that Denny Martin Fairfax took by devise; and the authorities, before referred to, shew, that the seizin was transferred to him by operation of law.
The question then is, Whether the seizin was ever disturbed before the date of the deed to the appellant? And, we think, it was not; because no office had ever been found to divest it. 8 Co. 169; 2 Inst. 206, 207; 3 T. Rep. 734. For the act of 1779, did not produce that effect; because that statute vested the property in the commonwealth, not by way of confiscation, but of escheat; and, in terms, required an office; which was to lie in the general court a month before the title should be barred, or any sale of the lands should be made. Ch. Rev. 99. These proceedings, *therefore, were indispensably necessary to convert the estate and extinguish the right of the owner; for the act of assembly falls far short of the provisions of the statute of treasons, 33 Hen. 8, ch. 20; which, in express words, dispensed with an office, and yet an inquisition was held necessary to complete the title of the king. Page’s case, 5 Co. 52.
This brings us' to enquire, whether the deed of Denny Martin Fairfax conveyed the rent in dispute to the appellant? We have already said, that it conveyed the land; arid that it transferred all the rents, except quit-rents, is equally clear. 1 H. Black. 30; 1 W. Black. Rep. 22. Consequently, as the rent demanded was not, according to our view of it, a quit-rent, it is not com-prized within the exception, but passed by the deed.
The only question, respecting the rig-ht to property, which could remain to be discussed, would be, Whether the commonwealth retained the rights conferred by the act of 1779, and can now proceed to an inquest of office; or whether they were not extinguished by the treaties between Great Britain and the United States, and our act of assembly in 1783?
Upon these points, the case of Read v. Read, in this court, (ante, 160,) was referred to as affording a rule for the decision of this cause. But, without meaning to decide the main question upon the treaty, we think there is no analogy between the two cases; because that was a descent claimed by an alien from an ancestor who died after the war; and this the case of an estate taken, during the war, by a devise which was capable of transferring it, whether the alien was able to hold, or not.
It is unnecessary, however, to pursue the enquiry; because the act of compromise in 1796, made during the pendency of a suit in this court, where all the points arose, has put an end to the controversy. For it makes Denny Martin Fairfax capable; and relinquishes to the appellant all claim, on the part of the commonwealth, to lands which had been appropriated by lord *998 Fairfax: and it is impossible to ^maintain, that the lot in question, which he had actually sold and was in the receipt of an annual rent for, had not been appropriated.
The consequence is, that, as the case finds that the rent was arrear and actually demanded, the appellant, having- the right of the commonwealth as well as that of Fairfax, may sustain his action to recover the land as incident to the rent. 14 Vin. 44; Cfo. Jac. 510; 2 Call, 249. For the passage cited from Eitt. sect. 347, to prove that, although the grantor may distrain, he cannot re-enter, is no longer law; because the statute of 32 Hen. 8, cap. 34, and our act of assemblj, have altered the common law in that respect. For they give the same right of entry to the assignee, that the grantor had: and it makes no difference that the words of both extend to leases for years and estates for life only,” as the reason is the same with regard to fee rents, which are within the equity of the laws; for “ubi lex est specialis, et ratio ejus generalis, generaliter excipienda est.” 2 Inst. 43; Cro. Jac. 511; ,2 Roll. Ab. 47.
The law with regard to pretensed titles, has nothing to do with the case; because that, even as to lands, relates only to those the title to which is actually disputed by the tenant at the time of the grant; but here, no dispute, either as to the rent, or the land, had arisen. Besides, the case finds that Denny Martin Fairfa!x was lawfully seized, which, of itself, removes the objection.
The judgment of the district court is therefore to be reversed; and judgment entered for the appellant.